Mark L. Anderson (5185)
Timothy J. Curtis (10195)
GOEBEL ANDERSON PC
405 South Main, Suite 200
Salt Lake City, UT 84111
Telephone: (801) 441-9393
manderson@gapclaw.com
tcurtis@gapclaw.com

*Attorneys for Defendant Scottsdale Insurance Company*

IN THE UNITED STATES DISTRICT COURT
DISTRICT OF UTAH – CENTRAL DIVISION

| | |
|---|---|
| STAKER & PARSON COMPANIES, INC., d/b/a WESTERN ROCK PRODUCTS, a Utah corporation <br><br> Plaintiff, <br><br> v. <br><br> SCOTTSDALE INSURANCE COMPANY, an Ohio corporation; COLORADO CASUALTY INSURANCE COMPANY, a New Hampshire corporation; HANCOCK-LEAVITT INSURANCE AGENCY, INC., an Arizona corporation; DOE INDIVIDUALS 1-10, unknown individuals; and ROE ENTITIES 1-10 unknown entities, <br><br> Defendants. | **SCOTTSDALE INSURANCE CO.'S MEMORANDUM REGARDING CERTIFICATION OF QUESTIONS TO THE ARIZONA SUPREME COURT** <br><br> District Judge David Nuffer <br><br> Magistrate Judge Paul Kohler <br><br> Case No. 4:18-cv-14-DN |

Pursuant to this Court's August 17, 2021 Order (Dkt. No. 126), Defendant

Scottsdale Insurance Company (hereinafter "**Scottsdale**"), by and through its

undersigned counsel of record, hereby submits the following Memorandum Regarding Certification of Questions to the Arizona Supreme Court.

## BACKGROUND

This action arises out of a personal injury lawsuit filed in the Superior Court in Pima County, Arizona (No. C20150432) (the "**Underlying Lawsuit**") in which William Baughn ("**Baughn**") sued his employer, Blake Reidhead Inc., d/b/a BDR Transport, ("**BDR Transport**") and Staker for bodily injuries arising from an accident that occurred at a mine owned and operated by Staker. On the date of the Accident, BDR held an automobile liability insurance policy issued by Scottsdale. Baughn initiated the Underlying Lawsuit on or about January 29, 2015, and on February 11, 2015, Staker tendered its defense and indemnity to Scottsdale. On March 26, 2015, Scottsdale denied the tender. A jury verdict was subsequently entered, which was apportioned 60% to Staker.

On January 18, 2018, Staker initiated the instant action against Scottsdale and alleged four causes of action for breach of contract, promissory estoppel, bad faith, and declaratory judgment based on Scottsdale's denial of Staker's request for defense and indemnity in the Underlying Lawsuit. Staker and Scottsdale have filed cross-motions for partial summary judgment. Staker has conceded that its' cause of action for indemnity is moot and that its' promissory estoppel claim cannot be proven. This

Court ordered the parties to submit memoranda discussing whether certain questions which have arisen in this matter should be submitted to the Arizona Supreme Court.[1]

1.      **QUESTIONS PRESENTED:**

1.   UNDER ARIZONA LAW, IS A HIRED CONTRACTOR'S VEHICLE BEING 'USED' BY THE HIRER WHEN THE HIRED CONTRACTOR IS CARRYING CARGO AND THE HIRER IS NOT ASSERTING ACTIVE OR ACTUAL CONTROL OVER THE GUIDANCE OR OPERATION OF THE VEHICLE?

2.   UNDER ARIZONA LAW, IS A PROPERTY OWNER'S MAINTENANCE OF A PREMISES A SUFFICIENT BASIS UPON WHICH TO FIND THE PROPERTY OWNER A 'USER' OF AN INSURED VEHICLE ABSENT ANY ALLEGATIONS THAT THE INSURED VEHICLE WAS INVOLVED IN ANY WAY RELATED TO THE PROPERTY OWNER'S INDEPENDENT DUTY TO ADEQUATELY MAINTAIN ITS PREMISES?

3.   UNDER ARIZONA LAW, CAN A COMPANY'S ACTS AND OMISSIONS RELATED TO MANAGERIAL FUNCTIONS, SUCH AS FAILING TO ESTABLISH SAFETY TRAINING PROCEDURES FOR INDEPENDENT CONTRACTORS OPERATING VEHICLES ON ITS PROPERTY, CONSTITUTE A "USE" OF THE INDEPENDENT CONTRACTORS INSURED AUTO?

2.      **THE RELATIONSHIP OF THE QUESTIONS PRESENTED TO THIS CASE AND THE EFFECT OF CERTIFICATION ON OTHER PROCEDURES IN THE CASE.**

The focus of the three questions presented in this memorandum relates to this case's unique facts and circumstances. Specifically, the questions relate to the scope of coverage in cases involving a hiring party's (Staker) claim that it was "using" a hired company's (BDR) covered auto. Yet, there is no evidence that the hiring party (Staker) exercised control or guidance over the hired company's (BDR) autos except for loading and unloading rock and other materials. These questions will resolve

---

[1] *See* Dkt. No. 126, August 17, 2021 Order for Briefing Regarding Certification of Questions to Arizona Supreme Court.

whether Arizona requires active or actual control as a prerequisite to the hiring company claiming coverage as a permissive user or additional insured under the hired company's auto policy.

These questions will determine whether Staker was "using" BDR's covered auto at the time of the Accident. The certification of these, or any question to the Arizona Supreme Court, will invariably delay the resolution of this matter. However, Scottsdale considers the issues presented in this case to consist of challenging and important public policy questions that the Arizona Supreme Court should decide. Accordingly, Scottsdale respectfully asks this Court to certify its questions to the Arizona Supreme Court under A.R.S. Sup. Ct. Rules 27(a)(3)(A).

### 3. AVAILABLE AUTHORITY ON THE QUESTION FROM APPELLATE DECISIONS, CONSTITUTIONAL PROVISIONS, OR STATUTES OF ARIZONA.

**QUESTION ONE: UNDER ARIZONA LAW, IS A HIRED CONTRACTOR'S VEHICLE BEING 'USED' BY THE HIRER WHEN THE HIRED CONTRACTOR IS CARRYING CARGO AND THE HIRER IS NOT ASSERTING ACTIVE OR ACTUAL CONTROL OVER THE GUIDANCE OR OPERATION OF THE VEHICLE?**

While Arizona law has not addressed all of the issues raised in this case, the Arizona Court of Appeals has considered whether a putative insured was "actively controlling" the insured vehicle in determining whether or not the putative insured was "using" the vehicle. [2] In *Westfield*, another motorist was injured by a driver towing the insured vehicle. The liability carrier of the tow truck company became

---

[2] Westfield Ins. Co. v. Aetna Life & Cas. Co., 739 P.2d 218 (Ariz. Ct. App. 1987).

insolvent and the injured motorist sought UIM coverage under the auto insurance policy for the towed vehicle. The *Westfield* court held that the tow truck driver was "using" the towed vehicle at the time of the accident, reasoning that the tow truck driver, "[W]as actively controlling the movement of both the tow truck and Decker's automobile. In our opinion, [tow driver] was 'using' [the insured's] automobile at the time of the accident."[3] Importantly, the *Westfield* court considered whether the putative permissive user was actively controlling the insured vehicle in determining whether or not they were "using" the insured vehicle.

An examination as to whether and to what extent a putative "permissive user" was actively controlling the insured vehicle is further examined in a subsequent case, *Barber v. Encompass Indem. Co.*. In *Barber*, an insured vehicle was being carried on flatbed trailer at time of accident.[4] In distinguishing *Westfield*, the 9th Circuit Court of Appeals held, "[*Westfield*] involved insurance coverage of an actively controlled, towed automobile. Here, only the flat-bed trailer was being towed and actively controlled, while the insured vehicle was nothing more than passive cargo. *Westfield* does not decide how to treat such a situation."[5] Apart from *Westfield* and *Barber*, there does not appear to be an Arizona case analyzing whether or not a putative "permissive user" was actively controlling the vehicle in determining their status as an insured on an automobile policy.

---

[3] *Id.* at 222
[4] Barber v. Encompass Indem. Co., 458 F. App'x 617, 618 (9th Cir. 2011)
[5] *Id.*

**QUESTION TWO:** UNDER ARIZONA LAW, IS A PROPERTY OWNER'S MAINTENANCE OF A PREMISES A SUFFICIENT BASIS UPON WHICH TO FIND THE PROPERTY OWNER A 'USER' OF AN INSURED VEHICLE ABSENT ANY ALLEGATIONS THAT THE INSURED VEHICLE WAS INVOLVED IN ANY WAY RELATED TO THE PROPERTY OWNER'S INDEPENDENT DUTY TO ADEQUATELY MAINTAIN ITS PREMISES?

In the Underlying Lawsuit, Baughn asserted a single claim for active negligence against Staker. Both Baughn's Complaint and First Amended Complaint allege that Staker had a duty to provide reasonably safe conditions at the Ina Pit and breached this duty by failing to maintain reasonably safe working conditions. *See* [Exhibit 4](#) at ¶¶ 71, 72; [Exhibit 5](#) ¶¶ 79, 83.

No court in Arizona has decided whether an automobile policy requires coverage for injuries caused by a landowner's negligently maintained premises. Also, this case is different from the majority of cases decided in Arizona because Staker's only alleged "use" of the vehicle is that Staker hired BDR to haul its products on the truck around the Ida Pit. While it is true that Arizona has adopted a broad reading of the definitions for the terms "use" and "using," nevertheless, none of the cases go as far as Staker's expansive definition of "use" and "using" does in this case. It's difficult to imagine that the Arizona legislature intended permissive user coverage to extend to individuals whose only connection to the accident was the presence of its materials or products on/in the vehicle.

Notably, the construction of an insurance contract follows certain well-established principles. Where a policy's language is ambiguous, "Arizona courts no longer resolve ambiguities in an insurance policy by automatically construing the

policy in favor of the insured."[6] Rather, "the rule in Arizona is that [courts] construe a clause subject to different interpretations by examining the language of the clause, public policy considerations, and the purpose of the transaction as a whole."[7]

Following the above principles, Arizona courts have repeatedly held that "the purpose of the permissive user or omnibus clause … is to ensure that permissive users of vehicles are insured <u>while they are driving in Arizona</u>."[8] The Arizona Supreme Court stated that the Financial Responsibility Act's principal purpose is the "<u>protection of the public</u> using the highways from financial hardship which may result from the use of automobiles by financially irresponsible persons."[9] Moreover, "not all injuries that incidentally involve an insured vehicle arise out of its 'use,' … the injury must be causally connected to the vehicle."[10] In other words, "an injury does not necessarily arise out of the use of a vehicle simply because it occurs inside the vehicle

---

[6] *Nichols v. State Farm Fire & Casualty Co.*, 175 Ariz. 354, 857 P.2d 405, 408 (Ct. App. 1993).

[7] *Id.* (alteration in original). *See also, Liristis v. Am. Fam. Mut. Ins. Co.*, 204 Ariz. 140, 144, 61 P.3d 22, 26 (Ct. App. 2002), *as amended* (Dec. 26, 2002) (Where insurance policy provision is ambiguous, courts are to examine the specific language of the provision at issue, and any applicable public policy considerations).

[8] *GRE Ins. Grp. v. Green*, 194 Ariz. 251, 254, 980 P.2d 963, 966 (Ct. App. 1999) (citations omitted)*(emphasis added).*

[9] New York Underwriters Ins. Co. v. Superior Court, 104 Ariz. 544, 545, 456 P.2d 914, 915 (1969) (Omnibus coverage is intended for the protection of accident victims other than the named insured)(emphasis added). *See also, Principal Cas. Ins. Co. v. Progressive Cas. Ins. Co.*, 172 Ariz. 545, 547, 838 P.2d 1306, 1308 (Ct. App. 1992) (Purpose of "permissive user" coverage is to "protect the motoring public "from financial hardship.").

[10] *United Fin. Cas. Co. v. Associated Indem. Corp.*, No. 1 CA-CV 15-0564, 2016 WL 6518491, at *3 (Ariz. Ct. App. Nov. 3, 2016) (Court held that the plaintiff was not "using" the shuttle van when she was injured when she fell facefirst into the snow after existing the shuttle van because she was some 10 to 12 feet away and could walk on her own. Thus, her injury did not arise out of her "use" of the shuttle van).

or at the hands of someone using a vehicle."[11] While, "[t]he requisite connection can exist in cases that involve injury caused by uses of a vehicle, such as to carry cargo, that do not directly involve driving,"[12] nevertheless "an injury does not necessarily arise out of the use of a vehicle simply because it occurs inside the vehicle or at the hands of someone using a vehicle."[13] That is, "An accident arises out of use of a vehicle only if it is 'caused by a negligent act in the use of the motor vehicle,'"[14] and if the "use of the vehicle itself was the cause of the injury."[15]

Here, Staker's claimed "use" is nothing short of an attempt to change the generally accepted understanding of the terms "use" and "using" to include instances and circumstances where a nondriver and nonowner are, at best, peripherally related to an insured autos use. Staker's far-reaching definition of the terms "use" and

---

[11] *Rule v. Allstate Fire & Cas. Ins. Co.*, No. 2 CA-CV 2016-0161, 2017 WL 3529108, at *2 (Ariz. Ct. App. Aug. 17, 2017) (collection of cases).

[12] *Id. See* Morari v. Atl. Mut. Fire Ins. Co., 105 Ariz. 537, 540, 468 P.2d 564, 567 (1970) (gunshot wound caused by negligent drove of loaded gun from truck's cargo); and Farmers Ins. Co. of Ariz. v. Till, 170 Ariz. 429, 432, 825 P.2d 954, 957 (App. 1991) (failure to secure window separating truck from camper resulted in dog attacking passenger).

[13] *Id. See also,* Ruiz v. Farmers Ins. Co. of Ariz., 177 Ariz. 101, 102–03, 865 P.2d 762, 763–64 (1993) (use of uninsured vehicle to pursue and shoot passenger in other car "facilitated" but did not cause victim's injury); Mazon v. Farmers Ins. Exch., 107 Ariz. 601, 603, 491 P.2d 455, 457 (1971) (no causal connection where insured injured by rock thrown from unidentified vehicle); Love v. Farmers Ins. Grp., 121 Ariz. 71, 73–74, 588 P.2d 364, 366–67 (App. 1978) (no causal connection where kidnappers drove insured's vehicle to remote location and beat him to death); Cantrell, 18 Ariz. App. at 487–88, 503 P.2d at 963–64 (injury to clerk shot by motorist through drive-up window did not arise out of use of vehicle); Brenner v. Aetna Ins. Co., 8 Ariz. App. 272, 273, 276, 445 P.2d 474, 475, 478 (1968) (no causal connection where passenger accidentally shot second passenger).

[14] *See* Associated Indem. Corp. v. Warner, 143 Ariz. 585, 587–88, 694 P.2d 1199, 1201–02 (App. 1983) (collision caused by use and unexpected starting of airplane engine, not by insured auto used only to charge battery), *modified on other grounds*, 143 Ariz. 567, 694 P.2d 1181 (1985).

[15] *Id.*

"using" demands ignorance of the previously recognized purpose for permissive user coverages: to prevent innocent drivers from bearing the financial responsibility for financially irresponsible drivers on Arizona roads. Permissive user coverage doesn't exist to protect a landowner from liability for negligently failing to maintain its land.[16] To construe the permissive user coverage under BDR's Policy to include Staker's definition of "use" and "using"—an inactive and passive user—would frustrate the purpose for such coverage and require a sharp deviation from the judicially recognized reasons for permissive user coverage in Arizona.

Therefore, the established policies and reasons for permissive use coverage, as recognized by the state of Arizona[17], undermine Staker's misplaced claim that it was "using" BDR's truck. Accordingly, the Court should reject Staker's claimed "use" of BDR's truck.

> **QUESTION THREE: UNDER ARIZONA LAW, CAN A COMPANY'S ACTS AND OMISSIONS RELATED TO MANAGERIAL FUNCTIONS, SUCH AS FAILING TO ESTABLISH SAFETY TRAINING PROCEDURES FOR INDEPENDENT CONTRACTORS OPERATING VEHICLES ON ITS PROPERTY, CONSTITUTE A "USE" OF THE INDEPENDENT CONTRACTORS INSURED AUTO?**

Baughn in the Underlying Lawsuit also alleged that Staker was negligent for failing to provide safety training. In turn, Staker demanded a defense from Scottsdale, arguing that its negligence in failing to provide safety training to BDR

---

[16] *See* New York Underwriters Ins. Co. v. Superior Court, 104 Ariz. 544, 545, 456 P.2d 914, 915 (1969) (Omnibus coverage is intended for the protection of accident victims other than the named insured).

[17] *Schecter v. Killingsworth*, 93 Ariz. 273, 280, 380 P.2d 136, 140 (1963) (The primary purpose of "permissive user" coverage is to protect the motoring public "from financial hardship").

drivers amounted to a "use" of BDR's trucks. This type of "use" has not been directly addressed by the courts in Arizona, but the numerous decisions by Arizona courts, when considered as a whole, challenge Staker's definition of "use."

In *United Fin. Cas. Co. v. Associated Indem. Corp.*, the Arizona Court of Appeals held that the plaintiff was not "using" the shuttle van at the time she sustained injuries.[18] The court reasoned that she was not "using" the shuttle van because she could walk independently and was ten to twelve feet away from the vehicle when she fell.[19] In *Brenner v. Aetna Insurance Co.*, the Arizona Court of Appeals held that an injury caused by one of the passengers in a vehicle who was "toying with a pistol which he accidentally discharged"[20] was not an injury that resulted from the operation or use of the vehicle, although it occurred during its use.[21] The *Brenner* Court further explained, "[f]rom the standpoint of causation, this injury could have occurred in the woods, in a hunting lodge, or in a house."[22] Further illustrating the lack of coverage when the automobile is merely the situs of the accident, the Supreme Court of Arizona, en banc, held that it found "no causal relationship between an injury resulting from a stone thrown by an unknown person

---

[18] No. 1 CA-CV 15-0564, 2016 WL 6518491, at *3 (Ariz. Ct. App. Nov. 3, 2016).

[19] *Id.*

[20] 8 Ariz. App. 272, 445 P.2d 474 (Ariz. App. Ct. 1968).

[21] *Id.*

[22] *Id.* (*But see, Morari v. Atl. Mut. Fire Ins. Co.*, 105 Ariz. 537, 540, 468 P.2d 564, 567 (1970) (The Arizona Supreme Court held that the reaching back into the car to retrieve the hunting rifle constituted an "unloading" of the vehicle not in close proximity to home, and thus the homeowner's policy excluded coverage. In effect the court held that the accident would have been covered by the automobile policy.)).

from an unidentifiable vehicle, and the ownership, maintenance or use of that vehicle."[23] [24]

Here, the allegation in the Underlying Lawsuit is that Staker failed to provide safety training, and that is not the type of injury related to the use of an automobile. Moreover, given the litany of cases where Arizona courts have refused to find "use" despite the injury and accident occurring within or by an occupant of a vehicle, here the alleged wrongdoing is Staker's failure to provide safety training procedures, not a misuse of BDR's truck. Staker's theory that coverage under an auto insurance policy is triggered when a business fails to perform its managerial functions, including providing safety training, is wholly incorrect and without legal justification in law or policy.

The idea that a company's failure to properly manage its business is a "use" insured auto merely because somewhere, somehow, an automobile accident occurs, which may have been avoided had the company correctly performed its managerial functions, is devoid of sound logic. If that were the case, an insurance company's duty to defend would be triggered whenever a company can point to a managerial mishap

---

[23] Mazon v. Farmers Ins. Exchange, 107 Ariz. 601, 491 P.2d 455 (1971).

[24] *See also,* Ruiz v. Farmers Ins. Co. of Ariz., 177 Ariz. 101, 102–03, 865 P.2d 762, 763–64 (1993) (use of uninsured vehicle to pursue and shoot passenger in other car "facilitated" but did not cause victim's injury); and Love v. Farmers Ins. Grp., 121 Ariz. 71, 73–74, 588 P.2d 364, 366–67 (App. 1978) (no causal connection where kidnappers drove insured's vehicle to remote location and beat him to death); Cantrell, 18 Ariz. App. at 487–88, 503 P.2d at 963–64 (injury to clerk shot by motorist through drive-up window did not arise out of use of vehicle).

or oversight that is, at most, distantly related to an automobile accident. Such an approach is contrary to the well-established logic applied by Arizona courts over the years and has been rejected by jurisdictions.[25]

## 4. AVAILABLE AUTHORITY ON THE QUESTIONS FROM DECISIONS, OF OTHER SOURCES.

Staker's effort to create the appearance of ambiguity in the definitions and understanding of the terms "use" and "using" is an attempt to expand coverage under automobile insurance policies well beyond its contemplated coverage. As noted above, Staker has argued that it was "using" BDR's insured truck at the time of the accident because the truck was hauling its material around the Ina Pit. However, Staker has failed to present any evidence demonstrating that it exercised even the slightest

---

[25] *See* *Hake v. Eagle Picher Co.*, 406 F.2d 893, 896 (7th Cir. 1969) (holding, "[T]he owner or person in custody of premises has been deemed to be using the automobile, … where by signal[ ]ing directions to the driver the owner of the premises … has exercised immediate control over the movement of the automobile. Where the owner of the prmises has exercise[d] little more control over the automobile than to invite it onto his premisss for a designated objective, the owner has been held not to be using the automobile."); *Celina Mut. Ins. Co. v. Aetna Life 7 Cas. Co.*, 454 N.W. 2d 93, 100 (Mich. 1990) ("Since Corrosion Control was negligent, if at all, under a landowner's liability claim and not from the use, ownership, or maintenance of the BLH boom truck, Corrosion Control is a nonmotorist defendant whose tort liability is beyond the scope of the no-fault act and Aetna's policy."); *Halifko v. Cities Serv. Oil Co.*, 510 F. Supp. 1131, 1136 (D. N.J. 1981), *aff'd sub nom. Cities Serv. Oil Co. v. Fireman's Fund Ins. Co.*, 676 F.2d 684 (3d Cir. 1982) (The court refused to "reallocate the ultimate financial risk of a [land]owner's negligence to the truck driver's insurance company."); *Marathon Oil Co. v. Cont'l Cas. Co.*, 543 F. Supp. 1052, 1055 (E.D. Mich. 1982) ("The proper inquiry is whether the injuries were caused by the active use of the premises owner's defective equipment or by the static, passive maintenance of a dangerous condition on the premises."); *Int'l Bus. Machines Corp. v. Truck Ins. Exch.*, 474 P.2d 431, 436 (1970) ("We therefore hold that the mere maintence of premises used for loading or unloading is not in itself a sufficient basis upon which to find the shipper a 'user' of the vehicle…").

control over BDR's trucks movement, let alone provide any guidance or instructions to BDR or BDR's employees.

While Arizona courts are silent on Staker's theory of "use," the Indiana Court of Appeals rejected an approach nearly identical to Staker's in *Protective Ins. Co. v. Coca Cola Bottling Co, 467 N.E.2d 786 (Ind. Ct. App. 1984)*. In that case, a trailer owned by the Coca-Cola Bottling Company–Indianapolis (Coke) was loaded with empty bottles and returned to Coke by a subcontractor.[26] The driver was unable to park at the loading dock, so the driver was instructed by a Coke employee where to park the trailer on Coke's premises.[27] The driver and the owner of the tractor began to disconnect the trailer from the tractor. As the tractor was being driven away from the trailer, the tractor became stuck in the ice and snow that had accumulated in the parking lot.[28] In the ensuing attempt to free the tractor, the owner was killed. Coke sought coverage under the vehicle owner's insurance policy[29], arguing that it was "using" the vehicle because it was putting the vehicle into its service and benefit.[30]

The Indiana Court of Appeals rejected Coke's arguments, finding insufficient control to make Coke a user of the tractor. The court noted, "Coke's dispatcher did not actively control, guide, or direct the movement of [the tractor] at the crucial

---

[26] *Id.*
[27] *Id.* at 787.
[28] *Id.* at 787-88.
[29] *Id.* at 789.
[30] *Id.*

moment, *i.e.,* when the truck was being disconnected."[31] In addition, the court was cognizant of the public policy implications underpinning their decision, "[W]e also decline to extend coverage to one remotely connected with the insured vehicle. A contrary holding would force truck owners and operators who exercise little or no control over the premises upon which they unload, to bear the financial burden of accidents resulting from the negligent maintenance of the receiving premises."[32]

Turning to the facts of this case, Staker exercised zero control over the movement of BDR's trucks and provided no guidance or instruction to BDR or its drivers. Applying the Indiana Court of Appeals analysis to the facts of the instant case, Staker "did not actively control, guide, or direct the movement of [BDR's truck] at the crucial moment, *i.e.,* when [Baughn attempted to dislodge the rock from between the trucks dual rear tires]."[33] Like in *Coca-Cola*, the harm, in this case, was not caused by the "use" of the truck but by Staker's neglect in failing to maintain its premises.

These undisputed facts make the conclusion that Staker was not "using" the truck even more apparent than it was in the *Coca-Cola* case, where Coke had exercised some control, guidance, and instruction over the movement of the tractor and trailer; just not enough. As such, Scottsdale was not required to defend Staker in the Underlying Lawsuit because Staker was not "using" BDR's truck at the time of

---

[31] *Id.* at 790.

[32] *Id.* at 790-91.

[33] *Id.* at 790 (alterations added).

the accident. A contrary holding would, as the Indiana Court of Appeals warned, "force truck owners and operators who exercise little or no control over the premises upon which they unload, to bear the financial burden of accidents resulting from the negligent maintenance of the receiving premises."[34]

Similarly, in *Wakefern Food Corp. v. General Acc. Group*, the New Jersey Court of Appeals rejected an argument similar to Stakers.[35] In *Wakefern*, a tractor-trailer owned by the driver's employer was backed into an unloading dock when the employee sustained injuries after his foot got caught in debris consisting of "a pallet, cardboard and excess wires."[36] The trucking company's employee sued the property owner for its negligent maintenance of the unloading area. The property owner claimed that it was an additional insured and demanded defense and indemnity under the trucking company's "Business Auto Policy."[37] The trial judge found that the property owner was entitled to a defense under the Business Auto Policy.

However, on appeal, the New Jersey Court of Appeals overruled the trial court, holding that although the employee's presence at the unloading area and his connecting of an electric cable to the trailer "were obviously related, in the required causal sense, to the unloading operation to be performed, *the cause of the accident, the hazardous condition of debris permitted by Wakefern to exist, was not 'within*

---

[34] *Id.* at 790-91.
[35] 188 N.J. Super. 77, 455 A.2d 1160 (App. Div. 1983).
[36] *Id.* at 79.
[37] *Id.*

*reason,' a condition necessary to the act of unloading nor had it any reasonable connection to that work.*"[38]

The appellate court further highlighted that "It taxes the limits of judicial imagination and impoverishes that necessary decisional quality to contemplate that a needless accumulation of debris, a simple violation of Wakefern's duty to its invitees, has any realistic nexus to the unloading process."[39] The court outright rejected the idea that inadequately maintained premises amount to "use" of the vehicles that come onto the premises.[40] In other words, to construe a landowners failure to maintain its' premises as a "use" of vehicles coming onto the premises "would be to extend automobile liability coverage to negligence occurring prior to the arrival of the truck," that is, the landowner's failure to remove or remedy dangerous conditions existing on the land.[41]

As in *Wakefern*, the underlying complaint in the Baughn Suit alleged that Staker failed to maintain the reasonably safe conditions on its property, which ultimately led to the Accident. In addition, the needless accumulation of rocks and other debris on Staker's roads existed before the arrival of BDR's trucks and drivers,

---

[38] *Id.* at 83-84 (italics added).

[39] *Id.*

[40] *Id.*

[41] *Atl. Mut. Ins. Co. v. Richards*, 100 N.J. Super. 180, 185, 241 A.2d 468, 471 (Ch. Div. 1968), *aff'd,* 105 N.J. Super. 48, 251 A.2d 134 (App. Div. 1969) ("[T]he sounder result favored by most courts is that automobile liability insurance under a loading and unloading clause should not cover damages sustained as a result of negligent maintenance of the premises where the loading or unloading was carried out. The risk insured against should be limited to negligence in loading or unloading the automotive vehicle, including preliminary and subsequent measures proximate in time related to its loading or unloading.")

and it was not a condition necessary for the completion of the work. Therefore, to reallocate the financial risks from Staker to BDR's automobile insurance carrier, Scottsdale, shifts the liability caused by Staker's negligence to BDR, and thereby Scottsdale. That is why other jurisdictions have refused, for sound policy reasons, to reallocate the financial risk of a landowner's negligence to an auto insurance company.[42]

In *Greentree Associates v. United States Fidelity & Guaranty Co.*,[43] a general contractor retained a subcontractor to perform certain site clearing work. During the course of the work, a subcontractor's employee was injured while refueling the subcontractor's vehicle. The injured employee filed suit alleging that the general contractor negligently "maintained, controlled, and supervised the [construction site]

---

[42] *See Hake v. Eagle Picher Co.*, 406 F.2d 893, 896 (7th Cir. 1969) (holding, "[T]he owner or person in custody of premises has been deemed to be using the automobile, ... where by signal[ ]ing directions to the driver the owner of the premises ... has exercised immediate control over the movement of the automobile. Where the owner of the prmises has exercise[d] little more control over the automobile than to invite it onto his premisss for a designated objective, the owner has been held not to be using the automobile."); *Celina Mut. Ins. Co. v. Aetna Life 7 Cas. Co.*, 454 N.W. 2d 93, 100 (Mich. 1990) ("Since Corrosion Control was negligent, if at all, under a landowner's liability claim and not from the use, ownership, or maintenance of the BLH boom truck, Corrosion Control is a nonmotorist defendant whose tort liability is beyond the scope of the no-fault act and Aetna's policy."); *Halifko v. Cities Serv. Oil Co.*, 510 F. Supp. 1131, 1136 (D. N.J. 1981), *aff'd sub nom. Cities Serv. Oil Co. v. Fireman's Fund Ins. Co.*, 676 F.2d 684 (3d Cir. 1982) (The court refused to "reallocate the ultimate financial risk of a [land]owner's negligence to the truck driver's insurance company."); *Marathon Oil Co. v. Cont'l Cas. Co.*, 543 F. Supp. 1052, 1055 (E.D. Mich. 1982) ("The proper inquiry is whether the injuries were caused by the active use of the premises owner's defective equipment or by the static, passive maintenance of a dangerous condition on the premises."); *Int'l Bus. Machines Corp. v. Truck Ins. Exch.*, 474 P.2d 431, 436 (1970) ("We therefore hold that the mere maintence of premises used for loading or unloading is not in itself a sufficient basis upon which to find the shipper a 'user' of the vehicle...").

[43] *Greentree Assocs. v. U.S. Fid. Guar. Co.*, 607 A.2d 175 (N.J. Super. Ct. App. Div. 1992).

thereby causing his injuries.[44] After suit was filed, the general contractor sought coverage as an additional insured under the subcontractor's auto policy. The *Greentree* court held:

> [general contractor] did not assume any control or direction over [the subcontractor's] vehicles or the operation of unloading the gasoline from the pickup truck and funneling it into the bulldozer. It [ ] therefore was not a user of those vehicles entitled to coverage as an additional insured.[45]

In support of its holding, the *Greentree* court further noted that courts in other jurisdictions similarly ruled that a general contractor will not be treated as using vehicles unless it asserts "active or actual control ... over the guidance or operation of the vehicles." The *Greentree* court held that although the general contactor had broad responsibility to ensure jobsite safety, a "failure to meet that responsibility does not create the required nexus to the loading and unloading activity[46]" for automobile insurance purposes.

Finally, the *Greentree* court observed the negative policy implications of overextending the reach of permissive user coverage:

---

[44] *Id. at 176*

[45] *Id. at 178*

[46] New Jersey's omnibus insurance statute and case law generally provide that a person or entity engaged in loading or unloading a vehicle is a "permissive user" related to that use. Arizona's omnibus insurance statute and case law provides the same "permissive user" status for loading and unloading. However, as recognized in Whilshire Ins. Co. v. Home Ins. Co., 880 P.2d 1148 (Ariz. Ct. App. 1994) the omnibus coverage requirement in Arizona does not apply to motor carriers as they are governed by a separate statute. Accordingly, an exclusion for loading and unloading contained in a motor carrier policy in Arizona may properly exclude a "permissive user" from coverage, whereas the same exclusion in New Jersey would generally be found unenforceable.

> Sound policy considerations weigh strongly against construing an omnibus clause to cover the owner of a loading platform on which a named insured is injured solely due to an unsafe condition on the premises. Such an interpretation would reallocate the ultimate financial risk of the platform owner's negligence to the truck driver's insurance company. This reallocation, in turn, would inevitably result in increased premiums to the motor vehicle operator. As a consequence, the owner of a plant or warehouse at which trucks are unloaded would be freed from a financial incentive to maintain his premises in a safe condition. Truck owners and operators, who exercise little or no control over the premises on which they unload, would be forced to bear the entire financial burden of accidents resulting from platform owners' lack of care.[47]

The same policy considerations are relevant to this Court's determination. Staker's expanded definition of "use" would reallocate the ultimate financial risk of a landowner's negligent maintenance of its premesis to the a trucking company and its its insurance company. In doing so, a premises owner would have less incentive to adequately maintain its premises resulting in a decrease in safety and an increase in workplace hazards. This result is counterproductive and should be rejected.

## 5.   STATEMENT OF RELEVANT FACTS

1.   Staker is a Utah corporation, which at all times relevant hereto was located in the state of Utah. *See*, Staker's First Amended Complaint, Jan. 25, 2018, ECF No. 2 (Attach. 6), ¶ 1, attached hereto as Exhibit 1.

2.   Scottsdale provided an automobile liability insurance policy to Blake Reidhead Inc., d/b/a BDR Transport ("BDR"), policy no. OPS0062348 (the "BDR

---

[47] *Id.* at 179. (quoting *Halifko v. Cities Serv. Oil Co.,* 510 *F.Supp.* 1131, 1136-37 (D.N.J.1981)).

Policy"). *See*, Staker's First Amended Complaint at ¶ 26. A true and correct copy of the BDR Policy is attached hereto as <u>Exhibit 2.</u>

3.  BDR is an Arizona corporation and purchased its insurance policies from Hancock Leavitt in Arizona. *See*, Memorandum Decision and Order Granting Defendant's Motion to Dismiss [Dkt. No. 56] at 2.

**The Haul Agreement**

4.  Staker entered into a contract (the "Haul Agreement") with BDR in which BDR agreed to perform the work of hauling rocks in tractor-trailer trucks owned and operated by BDR. *See*, First Amended Complaint [Dkt. No. 2 – 6] at ¶ 14. A true and correct copy of the Haul Agreement is attached hereto as <u>Exhibit 3</u>.

5.  Paragraph 7 of the Haul Agreement contains an indemnity provision, which provides, in pertinent part, as follows:

> [BDR] agrees to protect, indemnify, hold harmless and defend [Staker], its parent, and related companies, and the officers, directors, employees, workmen, agents, servants and invitees of [Staker], its parent, and related companies, from and against all losses, damages, demands, claims, suits and other liabilities, including attorney fees and other expenses of litigation, because of (i) bodily injury, including death at any time resulting therefrom; and (ii) damages to all property, including loss of use thereof and downtime; and (iii) violation of or failure to comply with any applicable law, regulation, rule or order, which occur, either directly or indirectly, in connection with performance of the Work contemplated hereunder or by reason of [BDR] and its employees, workmen, agents, servants, subcontractors and vendors being present on [Staker]'s premises, except to the extent attributable to the negligence of [Staker]. .... [BDR]'s indemnity and defense obligations shall apply to any claim against [Staker] covered by [BDR]'s indemnity

obligations hereunder that is set forth by any employee of [BDR] and [BDR] shall not assert as a defense in any suit by [Staker] to enforce [BDR]'s obligations under this section 7 or any immunity or other defense provided under any worker's compensation or other laws.

See, [Exhibit 3.]

6. Paragraph 9 of the Haul Agreement states "In the performance of all work hereunder, [BDR] shall be an independent contractor. [Staker] is to exercise, and have no control over the method and means of accomplishing the work other than to see that the desired results are achieved at the lowest possible costs to [Staker]." *See,* [Exhibit 3.]

7. Separately, the Haul Agreement contains an insurance provision that provides that in addition to the indemnity obligations, BDR Transport was required to obtain various types of insurance, including Worker's Compensation, General Liability, and Automobile Liability. *Id.*

8. The Haul Agreement required BDR Transport to name Staker as an additional insured on all of its aforementioned insurance policies, with such coverage being primary and waiving all rights of subrogation against Staker. *Id.*

**The Underlying Lawsuit**

9. On January 29, 2014, BDR's employee William L. Baughn was accidentally injured while performing work for BDR (the "Accident"). Baughn is an Arizona resident. *See,* [Exhibit 1], Staker's First Amended Complaint [Dkt. No. 2 – 6] at ¶ 22.

10.     The Accident occurred at the Ina Pit which was owned and operated by Staker at the time of the Accident.  The Ina Pit is located in Arizona. *See*, Baughn Complaint at 2, attached hereto as Exhibit 4.

11.     As a result of the Accident, on January 29, 2015, Baughn filed a lawsuit (the "Underlying Lawsuit") in an Arizona State Court against Staker and BDR. *See*, First Amended Complaint [Dkt. No. 2 – 6] at ¶ 23. *See also*, Exhibit 4 Baughn Complaint.

12.     The Baughn Complaint alleged one cause of action against Staker for negligence. *Id.*

13.     On March 18, 2015, Baughn filed his First Amended Complaint. *See*, Baughn's First Amended Complaint, a true and correct copy of which is attached hereto as Exhibit 5.

14.     The First Amended Complaint alleged one cause of action against Staker for negligence. *Id.*

15.     Both Baughn's Complaint and First Amended Complaint allege that Staker had a duty to provide reasonably safe conditions at the Ina Pit and breached this duty by failing to maintain reasonably safe working conditions. *See*, Exhibit 4 at ¶¶ 71, 72; Exhibit 5 ¶¶ 79, 83.

16.     The Baughn Complaint and First Amended Complaint also alleged that Staker overloaded and/or unevenly loaded the trailer and a failed to maintain the road at the mine. *See*, Exhibit 4 at ¶¶ 72, 73, 76; Exhibit 5 ¶¶ 24-28, 82, 83.

17.     With respect to the alleged overloading and/or uneven loading, the Baughn Complaint and First Amended Complaint alleged that Staker employees operated a dirt loader and had equipment which allowed the reasonably precise calculation of the weight of materials loaded onto the trailer. *Id.*

18.     On April 6, 2015, Staker filed its Answer to Baughn's First Amended Complaint and asserted a cross-claim against BDR ("Staker's Answer and Cross-Claim). A true and correct copy of Staker's Answer and Cross-Claim is attached hereto as Exhibit 6.

19.     Staker's cross-claim against BDR asserted four causes of action, (1) Breach of Contract, (2) Breach of the Implied Covenant of Good Faith and Fair Dealing, (3) Indemnity, and (4) Apportionment of Fault.

20.     On August 4, 2016, BDR filed a Motion for Summary Judgment against Staker on its cross-claims. A true and correct copy of BDR's Motion for Summary Judgment is attached hereto as Exhibit 7.

21.     On September 20, 2016, Staker opposed BDR's Motion for Summary Judgment. As part of its opposition, Staker represented to the trial court that BDR failed to add Staker as an additional insured to BDR's automobile liability policy with Scottsdale. *See*, Staker's Memorandum Opposing BDR's Motion for Summary Judgment at Statement of Fact 2, attached hereto as Exhibit 8.

22.     On October 4, 2016, BDR filed its Reply to Staker's Memorandum Opposing BDR's Motion for Summary Judgment. A true and correct copy of BDR's Reply Memorandum is attached hereto as Exhibit 9.

23.     On October 24, 2016, the trial court in the Underlying Action heard oral argument on BDR's motion for summary judgment against Staker. *See*, Under Advisement Ruling Dated October 28, 2016, a true and correct copy of which is attached hereto as Exhibit 10.

24.     Subsequently, on October 28, 2016 the trial court issued a ruling on BDR's motion. In granting summary judgment on Staker's indemnity claims, the trial court found the following:

> The Court finds the contract clearly and unambiguously sets forth a general indemnity argument allowing for indemnification for a loss resulting in part from Staker's passive negligence, but not active negligence.
>
> The Complaint alleges specific acts of negligence committed by Staker. It does not contain allegation (sic) of passive negligence against Staker.

*See*, Exhibit 10 Under Advisement Ruling Dated October 28, 2016.

25.     On June 14, 2017, at the conclusion of a jury trial in the Underlying Lawsuit, the jury announced a verdict in favor of Baughn for damages in the total amount of $2,550,000, apportioned as follows: 25% to Baughn, 60% to Staker, and 15% to BDR. *See*, Exhibit 1 First Amended Complaint at ¶ 25.

26.     Staker appealed the trial court following the conclusion of the jury trial. On October 22, 2018, the Arizona Court of Appeals, Division Two issued a decision

vacating the court's judgment and remanding for a judgment in favor of Staker. A true and correct copy of the Arizona Court of Appeals decision is attached hereto as [Exhibit 11](#).

### Scottsdale's Investigation and Subsequent Denial of Staker's Tender of Defense

27.     On February 11, 2015, Staker sent a letter tendering its indemnity and defense in the Lawsuit to Scottsdale. *See*, Staker's First Amended Complaint [Dkt. No. 2 – 6] at ¶ 31.  A true and correct copy of the February 11, 2015 letter is attached hereto as [Exhibit 12](#).

28.     Staker's tender letter to Scottsdale included a copy of the Complaint in the Underlying Action, a copy of the Haul Agreement as well as copies of two insurance certificates. *[Id.](#)*

29.     Exhibit C to Staker's tender letter are two certificates of liability insurance which were issued by Hancock-Leavitt Insurance as insurance agent for BDR Transport. Each Certificate of Liability Insurance covered different policy periods. *[Id.](#)*

30.     Each Certificate of Insurance relevantly specified that they:

        a.      were "issued as a matter of information only and confer[red] no rights upon the certificate holder." *[Id.](#)*

        b.      "[do] not affirmatively or negatively amend, extend or alter the coverage afforded by the policies" listed on the Certificate.  *[Id.](#)*

c.      "[do] not constitute a contract between the issuing insurer(s) . . . and the certificate holder." *Id.*

31.    Each Certificate of Insurance specified that BDR Transport held automotive liability insurance through Scottsdale Insurance Company. *Id.*

32.    On February 17, 2015, Ken Harris a claims handler for Scottsdale began a coverage analysis. On or before February 19, 2015, Mr. Harris submitted his recommendations relative to coverage to Scottsdale's Technical Resource Center ("TRC") in order to obtain approval to retain coverage counsel. *See*, Claims File Notes at SCOTTSDALE003343-003365 at 003354-003355. A true and correct copy of the Claims File Notes are attached hereto as Exhibit 13. *See also*, Deposition of Ken Harris at P. 214 L.18—P. 215 L. 14; P. 251 L. 2—P. 252 L. 15. A true and correct copy of the Deposition of Ken Harris is attached hereto as Exhibit 14.

33.    On or before February 19, 2015, Jacquline Pincus, a member of the TRC, approved the retention of coverage counsel. Later that day, Ken Harris retained Scott McMickle and Jonathan Kandell of McMickle, Kurey, & Branch, LLP ("coverage counsel") for a coverage review/opinion. *See*, Exhibit 13 at SCOTTSDALE003355.

34.    On March 26, 2015, Scottsdale, through coverage counsel, responded to Staker's tender of defense and indemnity. The March 26, 2015 letter denied coverage to Staker for the claims asserted in Baughn's Underlying Litigation. A true and correct copy of the March 26, 2015 letter is attached hereto as Exhibit 15.

35. Craig Hall, a 30(b)(6) witness for Staker, testified that Scottsdale's March 26, 2015 letter was acknowledged by Staker as an outright denial of its claim:

> Q. At the time that you received this March 26, 2015, letter from Scottsdale on behalf of McMickle, Kurey & Branch, did you -- did Staker believe that this was an outright denial of the defense and indemnity request made by Staker?
> A. Yes. Yes, I think so.
> Q. Okay.
> A. When it says you're not an insured, that's why -- I don't know any insurance policy that provides coverage to any party that's not an insured. So I took that as an outright denial.

*See*, 30(b)(6) Deposition of Craig Hall at P. 49 L. 19—P. 50 L. 4. A true and correct copy of the 30(b)(6) Deposition of Craig Hall is attached hereto as [Exhibit 16](Exhibit 16).

36. Over a year later, on July 11, 2016, Staker sent a second letter tendering its indemnity and defense in the Lawsuit to Scottsdale. A true and correct copy of the July 11, 2016 letter is attached hereto as [Exhibit 17](Exhibit 17).

37. On July 29, 2016, Scottsdale, through its coverage counsel, sent a letter to Staker denying Staker's request to defend and indemnify Staker under the Scottsdale Policy in the Lawsuit. A true and correct copy of the July 29, 2016 letter is attached hereto as [Exhibit 18](Exhibit 18).

38. On August 16, 2016, Staker sent a third letter responding to Scottsdale's July 29, 2016 letter. The August 16, 2016 letter contained a Utah Business Name Registration wherein Staker identified Western Rock Products as d/b/a. *See*, First Amended Complaint [Dkt. No. 2 – 6] at ¶¶ 35-36. A true and correct copy of the August 16, 2016 letter is attached hereto as [Exhibit 19](Exhibit 19).

39.     With respect to any representations or promises made by Scottsdale that Staker was an additional insured and that the coverage was non-contributory, Staker's 30(b)(6) representative Craig Hall testified:

> **Q.**   Were there any specific representations made by Scottsdale to Staker that Staker was an additional insured under the Scottsdale policy?
> **A.**   No.  All the communications I'm aware say that Staker was not.
> **Q.**    Okay. Were there any specific representations made by Scottsdale to Staker that the coverage under the police (sic) was primary and noncontributory?
> **A.**   No.  There must be an insurance certificate.

*See*, Exhibit 16, 30(b)(6) Deposition of Craig Hall P. 124 L. 5 –L. 9.

40.     Additionally, with respect to any representations made by Scottsdale that the BDR Policy provided all of the coverage required in the Haul Agreement, Mr. Hall testified:

> **Q.**    Did Scottsdale ever directly represent to Staker that the policies provided all coverage as are required in the Haul Agreement?
> **A.**   Scottsdale did not.

*Id*. at P. 125 L. 9—L. 12.

### Relevant Portions of the BDR Policy

41.     Section II, Paragraph A.1. of the Motor Carrier Coverage Form in the BDR Policy defines "Who Is An Insured," in pertinent part, as follows:

> The following are "insureds":
>
> a.      You for any covered "auto".[48]

---

[48] The Motor Carrier Coverage Form provides that the words "you" and "your" refer to the

b.  Anyone else while using with your permission a covered "auto" you own, hire or borrow except:

   (1)  The owner or any "employee", agent or driver of the owner, or anyone else from whom you hire or borrow a covered "auto".

   (2)  Your "employee" or agent if the covered "auto" is owned by that "employee" or agent or a member of his or her household.

   (3)  Someone using a covered "auto" while he or she is working in a business or selling, servicing, repairing, parking or storing "autos" unless that business is yours.

   (4)  Anyone other than your "employees", partners (if you are a partnership), members (if you are a limited liability company) a lessee or borrower of a covered "auto" or any of their "employees", while moving property to or from a covered "auto".

   (5)  A partner (if you are a partnership), or a member (if you are a limited liability company), for a covered "auto" owned by him or her or a member of his or her household.

c.  The owner or anyone else from whom you hire or borrow a covered "auto" that is a "trailer" while the "trailer" is connected to another covered "auto" that is a power unit, or, if not connected, is being used exclusively in your business.

                    ****

e.  Anyone liable for the conduct of an "insured" described above but only to the extent of that liability.

---

Named Insured shown in the Declarations: BDR.

*See*, Exhibit 2 at SCOTTSDALE000064.

42.   Section II, Paragraph B of the Motor Carrier Coverage Form in the BDR

Policy contains certain exclusions to coverage, in pertinent part, as follows:

> This insurance does not apply to any of the following:
>
> ****
>
> 8.   Movement Of Property By Mechanical Device
>
> > "Bodily injury" or "property damage" resulting from the movement of property by a mechanical device (other than a hand truck) unless the device is attached to the covered "auto".

*See*, Exhibit 2 at SCOTTSDALE000066.

43.   The BDR Policy includes a "Designated Insured" Endorsement, which

"identifies person(s) or organization(s) who are 'insureds' under the Who Is An

Insured Provision of the Coverage Form."   *Id.*, Designated Insured Endorsement,

SCOTTSDALE000088–89.

44.   Persons and/or organizations identified within the Designated Insured

Endorsement are identified in entirety as follows:

> 1.   Cemex, Inc. and Shipper, Affiliates, Subsidiaries; Glenview, IL;
> 2.   Western Rock Products; St. George, UT;
> 3.   Vulcan Materials, Co. and Subsidiaries; Phoenix, AZ;
> 4.   Gins Brokerage Inc.; Plymouth, MI;
> 5.   Hanson Aggregate AZ, Inc.; Clarkdale, AZ;
> 6.   M.R. Tanner Mining, Inc., M.R. Tanner Mining E&L LLC, and Queen Creek Pit LLC; Gilbert, AZ

*Id.*

45. The Designated Insured Endorsement "does not alter coverage provided" within the BDR Policy. *Id.*

46. BDR's insurance agent intentionally did not list Staker on the Designated Insured Endorsement based on his understanding that Staker only wished to be added as an additional insured to BDR's commercial general liability policy with a separate insurer, Colorado Casualty. *See*, 30(b)(6) Deposition of Hancock Leavitt Insurance Agency, Inc. and Monti Hancock individually, July 6, 2016, at P. 43 L.11—P. 45 L. 9; P. 76 L. 21—L. 25, attached hereto as Exhibit 20.

**6. THE ANTICIPATED TIME AND EXPENSE OF RECEIVING AN ANSWER TO THE QUESTIONS PRESENTED.**

The questions presented have already researched and have been briefed. While there would be some additional time and expense in presenting these questions to the Arizona Supreme Court, counsel for Scottsdale is already admitted to practice in Arizona. Accordingly, the time and expense of receiving an answer to the questions presented appears to be minimal.

**7. ISSUES OF COMITY AND THE IMPACT OF AN AUTHORITATIVE DECISION BY THE ARIZONA SUPREME COURT ON THIS AND OTHER LITIGATION OR DISPUTES.**

The United States Supreme Court has explained that the doctrine of comity "'teaches that one court should defer action on causes properly within its jurisdiction until the courts of another sovereignty with concurrent powers, and already cognizant

of the litigation, have had an opportunity to pass upon the matter.'"[49] Courts in Arizona have similarly taught: "The principle of comity is that the courts of one state or jurisdiction will give effect to the laws and judicial decisions of another state or jurisdiction, not as a matter of obligation, but out of deference and mutual respect."[50] Moreover, the "scope and applicability of comity rest within the court's discretion."[51]

The decision to certify questions to the Arizona Supreme Court would advance the purposes of comity because the disputed issues, in this case, are governed exclusively by Arizona law, and Arizona has not had the opportunity to issue an authoritative decision on these issues. However, the authoritative resolution of these questions is unlikely to impact many Arizona cases due to the uniqueness of the arguments and circumstances presented here. Accordingly, the principles of comity will be realized if the questions are certified to the Arizona Supreme Court; though, the significance of a decision, if any, by the Arizona Supreme Court will likely apply to a handful of cases only.

## 8.  LIST OF DOCUMENTS TO BE ATTACHED TO THE CERTIFICATION ORDER TO THE ARIZONA SUPREME COURT.

- The automobile liability insurance policy to Blake Reidhead Inc., d/b/a BDR Transport, Policy no. OPS0062348.

- The Haul Agreement between BDR Transport and Staker.

---

[49] *Rhines v. Weber*, 544 U.S. 269, 274, 125 S. Ct. 1528, 1533, 161 L. Ed. 2d 440 (2005) (quoting *Darr v. Burford,* 339 U.S. 200, 204, 70 S.Ct. 587, 94 L.Ed. 761 (1950)).
[50] *Gnatkiv v. Machkur*, 239 Ariz. 486, 490, 372 P.3d 1010, 1014 (Ct. App. 2016) (citing *Leon v. Numkena*, 142 Ariz. 307, 311, 689 P.2d 566, 570 (App. 1984)).
[51] *Id.*

- A copy of the Complaint and the First Amended Complaint in the lawsuit that William Baughn commenced against his employer, Blake Reidhead Inc., d/b/a BDR Transport, and Staker.

- A copy of Staker's Motion for Partial Summary Judgment, including all exhibits thereto and all responsive pleadings.

- A copy of Scottsdale's Motion for Partial Summary Judgment, including all exhibits thereto and all responsive pleadings.

## CONCLUSION

For the reasons stated herein, Scottsdale moves the Court to certify the questions presented in this case to the Arizona Supreme Court.

**DATED** this 24th day of September, 2021.

GOEBEL ANDERSON PC

*/s/ Timothy J. Curtis*
Mark L. Anderson
Timothy J. Curtis
*Attorneys for Defendant*

## **CERTIFICATE OF SERVICE**

The undersigned certifies that on September 24, 2021, I caused a true and correct copy of this document to be served via electronic case filing system (ECFS), and/or, if required, by the method(s) indicated below, in accordance with CJA Rule 4-503 and Utah Rules of Civil Procedure, to the following:

Matthew L. Lalli
Ben T. Welch
SNELL & WILMER L.L.P.
15 West South Temple, Suite 1200
Salt Lake City, UT  84101
mlalli@swlaw.com
bwelch@swlaw.com

*/s/ Karen Harwood*